IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **KEVIN V. GRAMMER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Civil No. 15-cv-119-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Kevin V. Grammer, represented by counsel, seeks judicial review of the final agency decision denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

**Procedural History**

Plaintiff applied for DIB and SSI on January 6, 2012. In both applications, plaintiff alleged disability beginning March 31, 2005. (Tr. 11).After holding an evidentiary hearing, ALJ Roxanne J. Kelsey denied the application for benefits in a decision dated September 30, 2013. (Tr. 11-23). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 12.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ improperly assessed plaintiff's RFC.

2. The ALJ improperly weighed medical opinion evidence.

3. The ALJ erred in plaintiff's credibility assessment.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  As is relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at

step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. **Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984).** See also, **Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See**, Books v. Chater, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing **Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995)**).

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richardson v. Perales, 402 U.S. 389, 401 (1971).** In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts,

decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ Kelsey followed the five-step analytical framework described above. She determined plaintiff had not been engaged in substantial gainful activity since the date of his application. She found plaintiff had severe impairments of lumbar degenerative disc disease, chronic obstructive pulmonary disease (COPD), anxiety disorder, and substance addiction disorder. The ALJ determined these impairments do not meet or equal a listed impairment. (Tr. 11-21).

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the medium level, with some physical and mental limitations. Based on the testimony of a vocational expert, the ALJ found that plaintiff was unable to do his past work. However, he was not disabled because he was able to perform other work that existed in significant numbers in the regional and national economies. (Tr. 21-23).

### The Evidentiary Record

The court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by the plaintiff.

1. **Agency Forms**

Plaintiff was born on September 6, 1960 and was forty-four years old at his alleged onset date. He was insured for DIB through March 31, 2010.[3] (Tr. 162). He was five feet eleven inches tall and weighed one hundred and thirty-five pounds. (Tr. 166).

Plaintiff previously worked as a welder in a coal mine, at a dragline erection and teardown site, and at a power plant. (Tr. 167). He completed the ninth grade and had no specialized training. (Tr. 166-67). Plaintiff felt his COPD, degenerative disc disease, depression, and anxiety limited his ability to work. (Tr. 166). In plaintiff's initial interview he had difficulty breathing, standing, and walking. (Tr. 163). In August 2013, he was taking Tramadol and Ibuprofen for pain, Lorazepam for anxiety, and Temazepam for insomnia. (Tr. 211).

Plaintiff completed a function report in March 2011 and stated that he lived alone in a mobile home. He felt his ability to work was limited because his back pain made it difficult to turn or bend, he had a hard time breathing, he could not walk very far, and he was frequently worried. (Tr. 184). On a daily basis, he woke up and watched television or visited with a friend. He also checked his friend's mail or helped mail things for him. (Tr. 185). He visited friends and family as much as possible. (Tr. 188).

Plaintiff was able to prepare his own food every day, but he typically only made easy meals like sandwiches or microwavable meals. (Tr. 186). He was also able to sweep and occasionally mow the lawn unless he could find

---

[3] The date last insured is relevant to the claim for DIB, but not the claim for SSI. See, 42 U.S.C. §§ 423(c) & 1382(a).

someone to help. (Tr. 186). Plaintiff drove his mother's car when needed and rode his bicycle two blocks to the convenience store when the weather permitted. (Tr. 187). He stated that before his pain worsened he hunted and fished a lot more. (Tr. 188).

Plaintiff reported having difficulties lifting, squatting, bending, walking, sitting, climbing stairs, using his hands, seeing, remembering, completing tasks, and following instructions. (Tr. 189). He stated he could walk "maybe a block" without needing to stop and rest for a few minutes. He could pay attention for a half an hour to an hour at a time and could only occasionally finish what he began. (Tr. 189). He was not taking medications at the time he filled out his function report. (Tr. 191).

**2. Evidentiary Hearing**

Plaintiff was represented by counsel at the evidentiary hearing on September 4, 2013. (Tr. 30). He stated that he had not worked since March 31, 2005. (Tr. 31). He felt his back pain, difficulty using his hands, breathing trouble, and depression precluded him from work. He lived by himself but across the street from his mother. Plaintiff had a car and was able to drive, but he no longer drove anywhere outside of the town where he lived due to his back pain. (Tr. 32). Plaintiff testified that he had no current hobbies outside of watching television and playing one or two songs on the guitar. (Tr. 35). He did not own a computer and stated that he did not know how to use one. (Tr. 36).

His mother drove him most places and typically shopped for his groceries. (Tr. 32). Plaintiff's mother also did his laundry, cleaned for him, and cooked

7

most of his meals. (Tr. 32-34). He stayed at his mother's house about every other day. One of plaintiff's neighbors mowed his lawn and shoveled his walkway when it snowed. (Tr. 34).

Plaintiff stated that most of his pain was located in the lower and middle portions of his back due to slipped and fractured discs. His lower back hurt more when he stood and the middle of his back hurt when he used his hands. He rated the pain as an eight out of ten. In order to alleviate the pain plaintiff had to change positions or lie down. (Tr. 39). He testified that Tramadol helped with the pain somewhat but he did not want to take any stronger medications. (Tr. 38). He had a Fentanyl patch in the past but he stopped using it because he was becoming too dependent upon them to get through the day. (Tr. 47).

Plaintiff testified that he last drank a month prior to the hearing and had about five beers. He stated that he had not taken non-prescribed drugs since 2005. (Tr. 41). When plaintiff worked, he drank daily and occasionally used marijuana and cocaine when he was in his twenties. (TR. 42). The ALJ noted that plaintiff's records indicated he consumed a significant amount of alcohol on a regular basis in 2011 and plaintiff stated that his drinking had tapered down recently and he did not have money for alcohol. (TR. 43-46). The ALJ also noted that plaintiff's records stated he had a history of taking sedatives and hypnotics, as well as cocaine abuse. Plaintiff stated that he was never a regular user of those drugs but experimented with them when he was younger. (Tr. 43).

A vocational expert (VE) also testified. (Tr. 50-57). The VE testified that plaintiff's past work as a welder was classified as medium skilled work and was performed on the heavy level. (Tr. 51-52).

The ALJ asked the VE a hypothetical where she was to assume a person with plaintiff's vocational and educational background and could perform medium work with no more than occasional exposure to fumes. Additionally, the person lacked the ability to understand, remember, and carry out detailed instructions but retained the ability to sustain concentration necessary for simple, routine, and repetitive work. (Tr. 52-54). The VE testified that this person could not perform plaintiff's previous work but could perform several unskilled jobs such as store laborer, packager, and janitor. (Tr. 53-54). The ALJ changed the hypothetical to light work with the same restrictions. The VE testified that jobs such as merchandise marker, office helper, and mailroom clerk would be available for the individual. (Tr. 54). The VE also testified that if the person was not on task and functioning eighty-five percent of an average workday he could not retain competitive employment. (Tr. 55).

### 3. Medical Evidence

Plaintiff's medical records from the Veterans Administration (VA) indicate he began receiving treatment for back pain in March 2005. However, the actual medical records from 2005 through 2009 are not a part of plaintiff's record. (Tr. 225). The first full records plaintiff has are from May 2009 when plaintiff again sought treatment for back pain. (Tr. 225, 243). He had a constant ache and intermittent burning pain that radiated from the lower back through the

buttocks. He stated that when he moved the wrong way he had severe pain. (Tr. 243). An X-Ray of plaintiff's lumbosacral spine from May 2009 showed degenerative intervertebral changes with anterior osteophyte formation and retrolisthesis[4] at L2-L3. It also showed plaintiff had diffuse osteoporosis/osteopenia that was noted to be uncommon for his age. (Tr. 221). An X-Ray of plaintiff's thoracic spine from the same month showed multiple wedge compression fracture, multiple mid and thoracic vertebral bodies, and kyphosis of the thoracic spine. (Tr. 223). Plaintiff also had an X-Ray of his chest performed which displayed thoracic scoliosis and COPD. (Tr. 222).

He returned to the VA in July 2009 with similar complaints of back pain. Doctors prescribed pain medications and muscle relaxants to alleviate plaintiff's symptoms. (Tr. 231-32). Plaintiff's next medical records regarding his back pain are from August 2011 at a pain clinic near his home. (Tr. 279-82). His description of the pain was that it was burning, dull, aching, piercing, and radiated to his right thigh. (Tr. 279). His doctor noted that he looked chronically ill and that he favored the right side of his body when he walked. (Tr. 281). Plaintiff had a follow up visit later that month where he reported tingling and numbness in his right lower extremity. (Tr. 276). He had more severe pain in his lumbar spine but otherwise his examination findings were the same as his previous visit. (Tr. 248). Plaintiff's final records regarding his back pain were from August 2013 with Dr. Ramesh Patel at the VA. (Tr. 275).

---

[4] Retrolisthesis is defined as the backwards slippage of one vertebral body on another. http://www.dartmouth.edu/sport-trial/Related_Papers/Shen_Retroslisthesis_TSJ_07.pdf

Dr. Patel noted that plaintiff sat comfortably without distress but prescribed him Tramadol for his pain. (Tr. 275-77).

In May 2009, plaintiff began receiving psychiatric treatment for anxiety. (Tr. 243). He was prescribed Bupropion after complaining of night sweats, weight loss, sleep disturbance, and nightmares. (Tr. 244-45, 260). Plaintiff returned to the VA due to anxiety in June 2009. (Tr. 239). On examination, plaintiff was anxious and guarded and the doctors diagnosed him with depressive disorder, NOS and a GAF[5] score of 50. (Tr. 239-40). In August 2011, plaintiff again sought treatment at the VA for anxiety. (Tr. 278-82). Plaintiff stated his anxiety began in 2005 and he experienced daily symptoms like difficulty concentrating, excessive worrying, paranoia, poor judgment, restlessness, and insomnia. (Tr. 279). His doctors prescribed him Buspar to alleviate the symptoms. (Tr. 278).

### 4. Opinion of Treating Physician

In August 2013, Dr. Patel completed a medical source statement for plaintiff. (Tr. 382-85). He opined that plaintiff could frequently lift or carry less than ten pounds, stand or walk less than two hours in an eight hour workday, and could sit for less than six hours in an eight hour workday. (Tr. 382-83). He also felt that plaintiff was limited in pushing and pulling with his lower extremities. He reasoned that plaintiff had decreased trunk and lower extremity mobility with significant pain as well as forward bent posture. Plaintiff also had

---

[5] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000); Although the American Psychiatric Association recently discontinued use of the GAF metric, it was still in use during the period plaintiff's examinations occurred.

decreased lower extremity strength with difficulty breathing during all physical activity secondary to COPD. Dr. Patel opined that plaintiff should never climb ladders, ropes, or scaffolds, and never kneel or crawl. (Tr. 383). Plaintiff should only occasionally climb ramps and stairs, crouch, or stoop and he could occasionally reach, handle, or finger. (Tr. 383-84). Finally, due to plaintiff's COPD and back problems he should only have limited exposure to temperature extremes, vibration, hazards like machinery or heights, fumes, odors, chemicals, and gases. (Tr. 385).

### 5. Consultative Examinations

Dr. Harry Deppe, Ph.D., performed a psychological consultative examination in July 2011. (Tr. 270-73). Plaintiff stated that he dropped out of high school to join the Navy, but while serving he completed his GED. (Tr. 270). Plaintiff told Dr. Deppe that he drank six to twelve cans of beer on a daily basis and he had for the past four years. (Tr. 271). Dr. Deppe opined that plaintiff's ability to relate to others, including fellow workers and supervisors, and his ability to understand and follow simple instructions was fair. (Tr. 272-73). He also felt plaintiff's ability to maintain attention required to perform simple repetitive tasks, and withstand the stress and pressures associated with day-to-day work activity was fair. Dr. Deppe's general prognosis for plaintiff was fair and he diagnosed plaintiff with alcohol dependence and a GAF score of 40-50. (Tr. 273).

In February 2012, plaintiff had a physical consultative examination performed by Dr. Adrian Feinerman. (Tr. 285-93). Plaintiff's primary complaint

at the time of the examination was shortness of breath and low back pain. (Tr. 285-86). Dr. Feinerman's diagnostic impressions were COPD and lumbar disc disease. Dr. Feinerman noted that plaintiff stated he had depression for the last three years and he did not go out and socialize. (Tr. 289). Plaintiff was able to sit, stand, walk, hear and speak normally. He was also able to lift, carry, and handle objects without difficulty. (Tr. 290).

### 6. Psychiatric Review Technique

Dr. Donald Henson, Ph.D. completed a psychiatric review technique based on plaintiff's records. (Tr. 318-30). He opined that plaintiff had mild limitations in his activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (Tr. 328).

### 7. RFC Assessment

In March 2012, state agency physician C.A. Gotway completed an assessment of plaintiff's physical RFC capabilities. (Tr. 333-39). He also reviewed plaintiff's records but did not examine plaintiff. He felt plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, and stand, walk, and sit for about six hours in an eight hour workday. (Tr. 333). Additionally, he felt plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 336).

## Analysis

Plaintiff argues that the ALJ erred in assessing plaintiff's RFC, weighing the medical evidence, and forming plaintiff's credibility assessment. Plaintiff contends that several portions of the RFC were formed in error including the

13

ALJ's failure to appropriately include limitations regarding plaintiff's usage of a cane, his need to lie down during the day, and difficulties with concentration, persistence, or pace.

The Court will begin with plaintiff's first argument regarding moderate limitations with concentration, persistence, and pace. The ALJ determined at step three of the sequential evaluation process that plaintiff had moderate difficulties in concentration, persistence, or pace due to his reported difficulties staying on task and his continued alcohol usage. (Tr. 15). The ALJ then formed plaintiff's RFC assessment concluding that plaintiff retained the ability to perform simple, routine, repetitive type work. (Tr. 16).

Plaintiff cites a series of recent Seventh Circuit cases that have held it is error for an ALJ to not include specific limitations in the RFC assessment when a claimant is found to have moderate difficulties in concentration, persistence, or pace. ***O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010), Y*urt v. Colvin*, 758 F.3d 850 (7th Cir. 2014), *Varga v. Colvin*, 794, F.3d 809 (7th Cir. 2015).**

In ***O'Connor-Spinner*** the Court emphasized that "for most cases, the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." ***O'Connor-Spinner*, 627 F.3d 620-21.** In ***Varga*,** the Seventh Circuit most recently held that the terms "simple, routine, and repetitive tasks" referred to unskilled work per the

14

regulations. The Court noted that "whether work can be learned in this manner is unrelated to the question of whether an individual with mental impairments—*e.g.*, with difficulties maintaining concentration, persistence, or pace—can perform such work." ***Varga,* 794 F.3d 814.** In ***Yurt***, the Court stated "we have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." ***Yurt,* 758 F.3d at 859.**

These three cases make it clear that if a claimant is found to have limitations in maintaining concentration, persistence and pace, those limitations must be spelled out in the RFC assessment and in the hypothetical question posed to the VE. It is important to note, however, that the Seventh Circuit has outlined exceptions to this rule. They have stated that if an ALJ identifies and excludes a specific work function that triggers the moderate limitations in concentration, persistence, or pace, then the RFC determination will be upheld.

In the case at hand, the ALJ failed to identify and exclude any specific work function that created plaintiff's moderate limitations. Plaintiff testified that he frequently forgot to refill his medications, he had difficulty concentrating on a specific task, and he often found his focus drifting. (Tr. 37, 189). Plaintiff had documented anxiety and depression. (Tr. 226, 233, 276, 279). He had to be reminded to do things regularly and his records indicated repeated alcohol abuse. (*Ex.*, Tr. 225, 240, 273). As a result of these findings,

15

the ALJ determined that plaintiff had moderate limitations with concertation, persistence, or pace. However, when she formulated her RFC assessment she did not create specific work related conditions to account for the moderate limitations. This is error.

The Commissioner argues that the ALJ's findings in steps two and three of the evaluation process were preliminary and not part of the actual RFC determination. She contends that the RFC was based solely upon the medical opinion of Dr. Deppe and as a result the Seventh Circuit's opinion in ***Johansen v. Barnhart*** is applicable. ***Johansen v. Barnhart*****, 314 F.3d 283 (7th Cir. 2002).** In ***Johansen***, the Court held that the ALJ's limitation to low-stress repetitive work was adequate since the ALJ relied upon the opinion of a consulting physician. ***Ibid.*** The Commissioner states that since Dr. Deppe did not opine that plaintiff had moderate limitations in concentration, persistence, or pace, and since the ALJ relied upon his opinion that there is no error. The Commissioner is incorrect.

The ALJ in ***Johansen*** relied upon a particular medical opinion that translated into specific work-related limitations. ***Ibid.*** Here, the ALJ did not fully rely on the consulting physician's opinion but rather made her own determination that plaintiff was moderately restricted in concentration, persistence, or pace based on the medical record and plaintiff's testimony. While she was not required to rely upon a specific medical opinion, she did need to specifically address how her restrictions to simple, routine, repetitive work applied to the moderate difficulties plaintiff would have with

16

concentration, persistence, or pace. Additionally, the ALJ in *Johansen* used the phrase "repetitive, low-stress work" to specifically account for the claimant's panic disorder. Here, the ALJ's analysis was inadequate as it did not specify how simple, routine, repetitive work would address plaintiff's particular difficulties with attention, anxiety, depression, and alcohol abuse.

The ALJ is "required to build a logical bridge from the evidence to [her] conclusions**."** *Simila v. Astrue*, **573 F.3d 503, 516 (7th Cir. 2009).** The ALJ needed to explain how simple, routine, repetitive work would account for plaintiff's moderate limitations in concentration, persistence or pace. ALJ Kelsey simply failed to do so here. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, **697 F.3d 642, 646 (7th Cir. 2012), citing** *Steele v. Barnhart*, **290 F.3d 936, 940 (7th Cir. 2002).**

It is not necessary to address plaintiff's other points at this time. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Grammer is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Kevin Grammer's application for social security disability benefits is **REVERSED** and **REMANDED** to the

Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE: February 1, 2016.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**
